Robert M. Hirsh
**ARENT FOX LLP**
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
robert.hirsh@arentfox.com

*Counsel for the DIP Lender*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GRACIOUS HOME LLC, *et al.*, | Case No. 16-13500 (MKV) |
| Debtors.[1] | (Jointly Administered) |

**STATEMENT OF GRACIOUS HOMES LENDING LLC IN SUPPORT OF DEBTORS'
AMENDED MOTION FOR (I) AN ORDER (A) APPROVING THE BIDDING
PROCEDURES FOR A SALE, (B) ESTABLISHING NOTICE PROCEDURES, (C)
SCHEDULING A HEARING ON THE SALE, AND (D) GRANTING THE RELATED
RELIEF AND (II) AN ORDER (A) APPROVING THE SALE OF THE ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND LEASES AND (C) GRANTING RELATED RELIEF**

Gracious Homes Lending LLC (the "DIP Lender") files this Statement (the "Statement") in support of the Debtors' Amended Motion for (I) an Order (A) Approving the Bidding Procedures for a Sale, (B) Establishing the Notice Procedures, (C) Scheduling a Hearing on the Sale and (D) Granting Related Relief and (II) an Order (A) Approving the Sale of the Assets Free and Clear of all Liens, Claims and Encumbrances and Other Interests and (B) Approving the Assumption and Assignment of Executory Contracts and Leases and (C) Granting Related

---

[1] The Debtors in these chapter 11 cases and the last four digits of their tax identification numbers are: Gracious Home Holdings LLC (3251); Gracious Home Payroll LLC (3681), Gracious Home LLC (3251); GH East Side LLC (3251); GH West Side LLC (3251); GH Chelsea LLC (3251) and Gracious (IP) LLC (3251). The latter five entities are disregarded for tax purposes and do not have their own tax identification numbers, but use that of Gracious Home Holdings LLC. The address of the Debtors' corporate headquarters is 1210 Third Avenue, New York, New York 10021.

AFDOCS/14534951.1

Relief [ECF No. 311] (the "Sale Motion")[2] and in response to the Objection of the Creditors' Committee to the Sale Motion [ECF No. 337] (the "Committee Objection") and in support, states as follows:

## STATEMENT

1. The DIP Lender supports the Sale of substantially all of the Debtors' assets to the Stalking Horse Bidder for the sum of (i) cash of over $4 million, (ii) payment of Cure Costs, and (iii) amounts necessary to pay Budgeted Expenses – an increase of more than $250,000 above the $3.75 million purchase price indicated in the base APA filed with the Sale Motion.[3] The Sale leaves more than $800,000 of cash in the estates after the DIP Obligations are satisfied, as well as certain estate causes of action that could yield additional value. The Sale also allows the business to be sold as a going concern and benefits numerous stakeholders, including the Debtors' employees and creditors who are counterparties to numerous contracts and who will continue to do business with the Purchaser. The Debtors' business judgment in seeking approval of the Sale is sound.

2. Yet the Committee (and sole objector) seeks to jeopardize the Sale transaction in a transparent effort that prioritizes extracting additional funds for the payment of its professional fees over maximizing the value of these estates and the potential for recoveries to its constituents to which it owes a fiduciary obligation. The Committee does not (because it cannot) question the Debtors' business judgment, which is the legal standard for approving the Sale under section 363 of the Bankruptcy Code. The market dictated the Purchase Price of over $4 million after the Debtors' engaged in a sale process and the Debtors have determined

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.
[3] Until now, the Committee has not objected to the Bidding Procedures or sale process.

2

moving forward with the Sale transaction with the Stalking Horse Bidder is in the best interests of the estates.

3.  Nor can the Committee seriously contend, let alone demonstrate, that its suggested alternative of foreclosure and the inherent risks associated with it, is in the best interests of these estates. Tellingly, the only justification for a foreclosure cited in the Committee Objection is the Committee's professional's desire to invoke the carve-out and be paid above all other constituents.[4] The Committee ignores entirely, the various benefits of a going concern sale, the risks of a foreclosure (including losing this Purchaser or any purchaser all together) and the virtual certainty that in a foreclosure, the Committee's own constituency, unsecured creditors, would receive no recovery because all causes of action that would otherwise be left in the estates under the contemplated Sale would be obtained by the DIP Lender. In other words, the Committee's proposed foreclosure path undoubtedly *injures* the prospects of recovery to unsecured creditors because it assures them no recovery as opposed to a potential recovery under the current process from retained estate causes of action.

4.  The Committee has elected to target the DIP Lender who provided new money under the terms of a post-petition DIP Facility to fund these Chapter 11 Cases.[5] At the time made, the DIP Loan was inherently risky given among other things, the fact that the Debtors' business was dormant and the value of the collateral uncertain. There is no dispute that without the DIP Loan, there would have been no sale process at all, let alone a successful one that yielded the current Sale transaction. Indeed, the Debtors have been able to improve their business in a short period. The DIP Lender provided the DIP Loan in accordance with and in

---

[4] The DIP Lender reserves all rights with respect to the Committee's contentions regarding the carve-out and related provisions of the Final DIP Order.
[5] The Committee fails to acknowledge that the DIP Lender is an independent third party who lent new money to the Debtors and is *not* a prepetition secured creditor who "rolled up" its prepetition debt into post-petition debt to dictate a sale process that resulted in its purchase the company.

3

reliance upon the DIP Loan Documents and the Final DIP Order.[6] The Committee's baseless allegations are inconsistent with the facts which demonstrate that throughout these Chapter 11 Cases, notwithstanding defaults under the DIP Credit Agreement, the DIP Lender worked cooperatively with the Debtors to ensure a full sale process moved forward and that the Debtors maximized value of these estates.

        A.    *The DIP Lender Fulfilled its Obligations and Enabled the Debtors to Maximize the Value of the Estates*

    5.    Achieving the current proposed Sale transaction required cooperation among the Debtors and the DIP Lender during uncertain and challenging circumstances over the course of these cases. Almost immediately following approval of the Interim DIP Order on February 2, 2017, the Debtors materially underperformed and failed to meet projections under the DIP Budget due primarily to challenging sales, slower than anticipated merchandise purchases and delay in re-starting the Debtors' web business. The DIP Lender worked with the Debtors to continuously revise the Budget in light of the Debtors' inability to reach their projections.[7] Despite the material shortfalls, the DIP Lender remained supportive of the business and sale process and took no public action that may have interfered with the sale process.

    6.    As May approached, the Debtors were concerned about liquidity and whether they would have an opportunity to expand the web business and produce sufficient data to prospective purchasers in advance of an auction to increase the potential purchase price. The Debtors' financial advisor warned against making substantial professional fee payments. Despite this warning, the Committee insisted that its professional fees be paid immediately. The Debtors

---

[6] The Final DIP Order is final and not appealable.

[7] By way of example, receipts for the thirteen (13) weeks ending on April 23, 2017 came in at $390,000 versus an expected amount of almost $2 million per the Budget included in the Interim DIP Order and web expenses were a mere $6,381 as opposed to an expected expenditure of over $440,000. Thus the Debtors missed their forecasts by almost 80%.

4

and DIP Lender wanted to avoid negative activity that could jeopardize an already fragile sale process and agreed to pay professional fees through April 16, 2017 in the amount of $461,754, more than $100,000 over the budgeted amount of $355,226.  In total to date, $672,120 has been paid to estate professionals, including $175,000 in professional fees for the week ending May 7, 2016, which was not budgeted or approved by the DIP Lender.[8]

7. The Debtors' failure to meet certain covenants described above resulted in defaults under the DIP Loan Documents.  The DIP Lender however, elected not to accelerate the DIP Loan or exercise its remedial rights after it issued a Notice of Default on May 22, 2017.  The DIP Lender also deferred discussion of its waiver fee until after the sale process was completed.  And, the DIP Lender continued to support the Debtors as they moved forward with the sale process.[9]  The DIP Lender satisfied its obligations under the DIP Loan Documents and Final DIP Order and enabled a sale process yielding over $4 million and excess cash of more than $800,000 as well as estate causes of action and the ability for the business to thrive.

### B. *The Committee Failed to Articulate a Legitimate Basis for Denying the Sale*

8. The Committee appears to request, without legal support, that the Court reject the Sale transaction, re-write the terms of DIP Loan Documents and Final DIP Order upon which the DIP Loan was made and require the DIP Lender to advance additional funds, or force the DIP Lender to foreclose on its assets in another forum.  As a threshold matter, the Committee fails to explain how such relief (even if available) stands to benefit these estates and unsecured creditors.  That is because such relief would be detrimental.

---

[8] The professional fees have not yet been allowed by the Court.  It is the DIP Lender's understanding that the Committee's professionals' fees are almost 80% of Debtors' professionals fees, a percentage that is simply astonishing.

[9] The DIP Lender offered to be a stalking horse bidder, which offer was denied by the Debtors.

9. The proposed Sale generates significant funds well above the DIP Obligations, preserves certain estate causes of action, facilitates the ongoing business of the Debtors, preserves jobs, enables a going concern sale, and benefits stakeholders with an interest in the business going forward. Alternatively, the Committee's proposal, other than allegedly benefiting the Committee's professionals, (i) creates significant risk for the Debtors' stakeholders and the ongoing business which would be forced to go dark and lose any potential purchasers thereby destroying the value of the Debtors' assets and (ii) solidifies that unsecured creditors receive no recovery once the DIP Lender forecloses on all of the Debtors' assets, including all causes of action.

10. Moreover and importantly, the Committee failed to provide any legal justification for such relief. The Final DIP Order is a final order. The DIP Lender advanced the funds on that basis. The Debtors proceeded with the sale process pursuant to the Bid Procedures Order and selected the Stalking Horse Bidder. The Debtors now seek approval of the Sale to the Stalking Horse Bidder consistent with that process and to distribute proceeds in accordance with the Debtors' obligations.

11. While not perfect, under difficult circumstances that often face chapter 11 debtors, the Sale of business is the best alternative for these estates. The fact that professionals may have incurred fees of well over $1 million (over $672,000 of which have been paid) and that the Committee would prefer to invoke the carve-out is not a basis for questioning the Debtors' business judgment or for fundamentally altering the sale and financing process established by prior Orders of this Court, including the Final DIP Order and DIP Loan Documents.

AFDOCS/14534951.1

WHEREFORE, the DIP Lender respectfully requests entry of an Order granting the relief requested in the Sale Motion.

Dated: New York, New York
June 26, 2017

                              Respectfully submitted,

                              **ARENT FOX LLP**

By: */s/ Robert M. Hirsh*
Robert M. Hirsh
1675 Broadway
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
robert.hirsh@arentfox.com

*Counsel for the DIP Lender*